**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| Heather Kellom,<br><br>Plaintiff,<br><br>v.<br><br>Centurion of Florida, LLC *et al.*,<br><br>Defendants. | Case No. 6:26-cv-00178-ACC-NWH |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff Heather Kellom, individually and as Personal Representative of the Estate of William Kellom, through her undersigned attorneys, submits this response in opposition to the Motion to Dismiss filed by Defendants Centurion of Florida, LLC, Lorenzo Miranda, and Rotisha James, ECF 22. The motion should be denied.

## BACKGROUND

**The Complaint's allegations about Mr. Kellom's medical care.** In January 2024, William Kellom, then 47, entered the Florida Department of Corrections ("FDC") at its Central Florida Reception Center ("CFRC") to serve a short sentence while awaiting work release. ECF 1 ¶¶ 10-12. On January 9, during intake, he had a routine dental appointment with Defendant Lorenzo Miranda, a Centurion dentist, who noted that Mr. Kellom's gums appeared inflamed. *Id.* ¶ 14.

On January 12, Mr. Kellom submitted an emergency sick-call request he hand-labeled a "dental emergency," reporting that a tooth was in such severe pain that he had not eaten in two days, could hardly talk, open his mouth, or swallow. ECF 1 ¶¶ 15, 21. Those symptoms, the Complaint alleges, were consistent with a spreading tooth infection—a condition in which bacteria invade the dental pulp and frequently spread into the body, where they can reach the brain and heart or enter the bloodstream to cause sepsis, including the flesh-eating tissue destruction of necrotizing fasciitis. *Id.* ¶¶ 16-19. Such symptoms, the Complaint alleges, require urgent medical attention within a day or two. *Id.* ¶ 20.

Mr. Kellom, however, was not seen until January 16. ECF 1 ¶¶ 22-23. He was again seen by Dr. Miranda, reporting swelling and that he had been unable to open his mouth or eat for several days. *Id.* ¶¶ 24-25. Dr. Miranda noted that tooth #32 was abscessed. *Id.* ¶ 26. Those symptoms, combined with a visibly abscessed tooth, indicated an active infection that had spread beyond the tooth and into the body. ECF 1 ¶ 27. Antibiotics are necessary but not sufficient to treat such an infection, the Complaint explains, because they cannot adequately penetrate or eliminate the infection inside the pulp; there is therefore a high risk they will fail, allowing the bacteria to spread rapidly and become more dangerous. *Id.* ¶¶ 28-30. For that reason, antibiotic efficacy must be monitored over the following 24 to 48 hours, and the infected tooth must be removed emergently so it does not remain a reservoir for the bacteria. *Id.* ¶¶ 31-33.

At the January 16 appointment Dr. Miranda recognized the infection and prescribed antibiotics, but he did not extract the tooth, provide other source treatment such as a root canal, or order any monitoring to ensure that the antibiotics were working. ECF 1 ¶¶ 34-36. Instead, he placed Mr. Kellom on a follow-up waiting list for extraction in five to seven days. *Id.* ¶ 38.

Mr. Kellom took the antibiotics, but they were ineffective. ECF 1 ¶ 39. His condition deteriorated. *Id.* On January 18, fellow prisoners got guards to take him to the medical unit, but staff sent him back untreated. *Id.* ¶ 40. By January 20 he was showing signs of necrotizing fasciitis: his infection was so foul-smelling that it made those around him gag. *Id.* ¶ 41. When medical staff came to his dorm that

day, he was so weak that he had to be brought by wheelchair. Staff could be seen covering their noses, yet still provided no care. *Id.* ¶¶ 42-43.

On January 21, Mr. Kellom fell and was taken to the prison's infirmary for a head laceration, where he was seen by another Centurion employee, Dr. Lopez. ECF 1 ¶¶ 44-45. Dr. Lopez noted blood in Mr. Kellom's mouth from an abscess "on inside of jaw, near lower molar"—indicating the infection had spread beyond the tooth—but took no steps to obtain emergent care. *Id.* ¶¶ 46, 48. Mr. Kellom was also seen that day by Defendant Rotisha James, an LPN, who noted the abscess and his ongoing course of antibiotics but likewise took no steps to intervene. *Id.* ¶¶ 50-51.

On January 22, Dr. Miranda saw Mr. Kellom and extracted tooth #32. ECF 1 ¶ 52. He noted dried blood throughout Mr. Kellom's mouth and on his lips, from the open abscess Dr. Lopez had observed the day before. *See id.* ¶ 46. An abscess persisting six days into an antibiotic course made it obvious that the antibiotics had failed and that Mr. Kellom faced grave danger from a systemic infection. *Id.* ¶ 55. Yet Dr. Miranda sought neither a diagnosis nor additional care. *Id.* ¶ 56.

Mr. Kellom returned to Dr. Miranda on January 23, having completed the antibiotic course. ECF 1 ¶ 57. He reported that he was still swollen and could not swallow, that the infection was leaking into his throat, that he had not eaten in days, and that he had passed out twice; he was ashy and pale and reeked of infection, and Dr. Miranda again noted blood around his mouth. *Id.* ¶¶ 57-58. These were all signs that the antibiotics had failed, that the infection had become systemic, and that Mr.

Kellom needed aggressive, emergent treatment. *Id.* ¶ 59. Yet Dr. Miranda made only a routine referral to follow up with medical as needed. *Id.* ¶¶ 60-61.

Mr. Kellom tried to get help. The next day he went back to medical and was seen by "C.L.," another Centurion employee. ECF 1 ¶ 62. By then, the Complaint alleges, the septic nature of his condition, including the odor of rotting flesh from necrotizing fasciitis, would have been obvious to any provider. *Id.* ¶ 62. "C.L.," however, took no steps to diagnose or obtain care for him. *Id.* ¶¶ 62-63.

That same day, Mr. Kellom filed another sick-call request reporting a "very serious tooth infection even after tooth extraction and antibiotics," that he had not eaten in two weeks, and that he was in pain and sick, pleading, "I need help (please)." ECF 1 ¶ 65. Told to report to dental the next day, he arrived January 25 weak, pale, sweating, near fainting, with blood in his mouth and low blood pressure. *Id.* ¶ 65. Staff assessed sepsis and referred him to an outside emergency room. *Id.* ¶ 67. By then Mr. Kellom's body was in septic shock from necrotizing fasciitis. *Id.* ¶ 68. The hospital removed his jaw, fingers, foot, and parts of his neck to stay ahead of the infection, but it was not enough. *Id.* ¶¶ 68-69. Mr. Kellom died on March 15, 2024, his cause of death assessed as complications of tooth decay. *Id.* ¶¶ 70-71.

**The Complaint's *Monell* allegations.** The Complaint alleges that the catastrophic failure to care for Mr. Kellom was not an isolated incident but was rather caused by Centurion's policies and practices. ECF 1 ¶ 73. Centurion, the Complaint alleges, maintained policies and practices under which prisoners with

serious medical needs were routinely denied care—specifically, widespread practices in which staff disregard reports of objectively serious symptoms; refuse to conduct or obtain diagnostic testing; fail to create a sensible treatment plan or ensure continuity of care; refuse to arrange outside treatment even when necessary; and operate without meaningful oversight or accountability. *Id.* ¶¶ 74-75. Because of these customs, the Complaint alleges, Centurion employees pervasively turn a blind eye to obvious health problems, causing often fatal delays in diagnosis and care. *Id.* ¶ 76.

These practices flourished, the Complaint charges, because Centurion directly encouraged the very misconduct at issue, failed to adequately train and supervise its employees, and failed to discipline prior instances of similar misconduct, making its policies the moving force behind the violations Mr. Kellom suffered, which Centurion's deliberate indifference effectively ratified. ECF 1 ¶¶ 77-79.

The Complaint offers several prior incidents as examples. ECF 1 ¶ 80. Curtis Dettmann died in an FDC prison in 2018 after Centurion staff ignored obvious symptoms of C. diff (a treatable post-surgical infection marked by a distinctive odor) and repeated warnings from his visiting sister; discharged with a routine follow-up, he died of sepsis alone in his cell hours later. Centurion was placed on notice through *McCrimmon v. Centurion of Florida LLC*, No. 3:20-cv-00036-BJD-JRK (M.D. Fla.). *Id.*

In September 2021 Elmer Williams received an "urgent" referral to a urologist for a possible return of prostate cancer, but the referral never occurred. By the time he was seen the cancer had metastasized and left him paralyzed. Centurion was on notice through *Williams v. Dixon*, No. 3:22-cv-01221 (M.D. Fla.). *Id.*

Raymond Gregg, diagnosed with a head malignancy in 2023 and upgraded from "routine to urgent" at a doctor's request, was repeatedly denied hospital admission, with a UF Health surgeon reporting that "numerous attempts had been made to admit Gregg into the hospital" to assess whether his "complex skull base malignancy" was operable, but that "these efforts have been refused" by FDC medical personnel. ECF 1 ¶ 80.

The complaint also alleges Centurion maintains widespread practices of denying basic eye care, including needed surgeries, leaving more than 1,000 inmates on a 2024 waiting list and rendering many permanently blind. *Id.* Finally, the Complaint alleges that Centurion is also liable through an individual with final policymaking authority—Dr. Miranda, who, on information and belief, directs dental services at the facility—and that Mr. Kellom's injuries were caused by persons acting pursuant to the policies and practices described above. *Id.* ¶¶ 81-82.

***The pleadings.*** Plaintiff's Complaint asserts state and federal claims against Centurion and Mr. Kellom's identified medical providers. The motion to dismiss, which is filed on behalf of Centurion, Dr. Miranda, and Rotisha James, seeks to dismiss the federal and state claims against all three defendants. *See* ECF 22 at 1.

**STANDARD OF REVIEW**

Under Rule 12(b)(6), a complaint must provide "more than . . . a formulaic recitation of the elements of a cause of action," but it "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). The complaint need only contain "enough facts to state a claim to relief that is

plausible on its face." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) (quotation omitted). This "is not akin to a 'probability requirement'"; the plaintiff need only allege "'enough fact to raise a reasonable expectation that . . . discovery will reveal evidence' of the claim." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556). The Court must accept all well-pleaded facts as true and draw all reasonable inferences in Plaintiff's favor. *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1534 (11th Cir. 1994).

## ARGUMENT

Plaintiff has alleged sufficient facts to sustain claims for deliberate indifference to Mr. Kellom's serious medical needs. The Complaint adequately pleads claims against both Centurion and the individual moving Defendants for the denial of adequate medical care leading to Mr. Kellom's death. Plaintiff has also pleaded facts sufficient to establish her state-law claims. Dismissal is not warranted.

### I. The Complaint states a claim for deliberate indifference against Dr. Miranda and Nurse James.

To establish liability on an Eighth Amendment deliberate indifference claim, a plaintiff must satisfy both an objective and a subjective element. First, he must "demonstrate, as a threshold matter, that he suffered a deprivation [such as a medical condition] that was, objectively, sufficiently serious." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024). Second, the plaintiff must demonstrate that the defendant exhibited "subjective recklessness as used in the criminal law," which means simply that the "defendant actually knew that his conduct—his own acts or

omissions—put the plaintiff at substantial risk of serious harm" from that medical condition. *Id.* at 1253 (quotations omitted).

Miranda and James do not dispute that Mr. Kellom had an objectively serious medical condition. Instead, they contend that the Complaint's allegations fail to demonstrate that they were deliberately indifferent to it—specifically, that they knew of a substantial risk of harm to Mr. Kellom from their acts and omissions. ECF 22 at 6. All the Complaint ultimately claims, they say, is that Dr. Miranda identified an abscess, provided antibiotics, extracted the tooth, and told Mr. Kellom to return to medical as needed, and that LPN James provided the care he sought, noting the abscess and his ongoing antibiotics. *Id.* The Complaint may allege that Miranda and James knew Mr. Kellom had an abscess, the defendants argue, but "there is no allegation that either Defendant was subjectively aware that the tooth abscess or any other condition of Mr. Kellom represented a medical emergency or that Mr. Kellom required emergency treatment." *Id.* at 7. The Complaint's allegations, they say, amount to a claim that the defendants *should* have known that Mr. Kellom needed emergent treatment—but *actual* knowledge is required to state a claim for deliberate indifference under the Eighth Amendment. *Id.* at 7-8. Notably, they point out, a deliberate indifference claim cannot lie where the prison official "'responded reasonably to the risk'" of which they were actually aware. *Id.* at 8 (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)).

This argument misunderstands the basic principles of a deliberate indifference claim. While deliberate indifference to a serious medical need does indeed require

actual knowledge of a risk, proving that knowledge does not require direct evidence in the nature of a confession. Rather, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk *from the very fact that the risk was obvious*." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (emphasis added). Additionally, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

These principles apply directly in situations where prison medical staff provide *some* care to a prisoner. That is so because

> even when a prisoner receives some medical care, a plaintiff states a claim for deliberate indifference if he alleges the care he received was "so cursory as to amount to no treatment at all," was grossly inadequate, or was guided by a "decision to take an easier but less efficacious course of treatment."

*McCrimmon v. Centurion of Fla., LLC*, No. 3:20-CV-36-BJD-JRK, 2021 WL 424348, *3 (M.D. Fla. Feb. 8, 2021) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). In the same vein, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

*McElligott* provides an apt application of this principle. *McElligott* reversed an entry of summary judgment in favor of two medical providers who knew the plaintiff's medical condition was worsening but never attempted a diagnosis and prescribed medications that were ineffective and which "did nothing to treat [his] deteriorating state." *McElligott*, 182 F.3d at 1257, 1259. In such a circumstance, *McElligott* held, "A jury could infer deliberate indifference from the fact that [Dr. Foley] knew the extent of [Elmore's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [Elmore's] condition," as well as the delay in providing that care. *Id.* at 1257-58.

These basic principles are fatal to the defendants' arguments here. The Complaint alleges that tooth infections pose a deadly, emergent threat of systemic infection; that they cannot be treated with antibiotics alone and require emergent treatment of the tooth; and that the efficacy of antibiotics must be monitored over 24-48 hours lest the bacteria infect the body. ECF 1 ¶¶ 16-20, 27-33. At the Rule 12 stage the Court can infer that as medical professionals, Dr. Miranda and Nurse James would have been aware of all this, particularly the emergent risk that tooth infections posed.

At the January 16 appointment Dr. Miranda did prescribe antibiotics. But he never performed the emergent tooth extraction or order the 24-48 hour monitoring that is required—both steps that, the Complaint alleges, were necessary to forestall the risk that the infection would become systemic. ECF 1 ¶¶ 31-38. It thus can be inferred that Dr. Miranda chose "to take an easier but less efficacious course of

treatment," *McElligott*, 182 F.3d at 1255, and that he elected to delay treatment even though doing so increased the risk Mr. Kellom would develop a systemic infection. Plaintiff's allegations, drawing reasonable inferences in her favor, state a claim for deliberate indifference from Dr. Miranda's first encounter with Mr. Kellom.

After January 16, the Complaint alleges, Mr. Kellom deteriorated and exhibited numerous additional symptoms of a systemic infection, including a history of not eating for days, weakness, and a telltale odor of rotting flesh. ECF 1 ¶¶ 39-43, 57-58. These were all signs that the antibiotics Dr. Miranda had prescribed on January 16 were ineffective and that Mr. Kellom's tooth infection had become systemic. *Id.* ¶¶ 39, 55, 59. Mr. Kellom saw Nurse James and Dr. Miranda during this period, and both professionals knew that he was on a course of antibiotics for a tooth infection. *Id.* ¶¶ 50-58. The Complaint alleges that there is a known, serious risk that tooth infections will resist antibiotics and become systemic, *id.* ¶¶ 28-31, and given Mr. Kellom's history and symptoms when he presented to James and Miranda after January 16, the risk that Mr. Kellom had in fact developed a systemic infection would have been obvious to both professionals and portended a deadly medical emergency. Yet neither professional sought to obtain the expedited diagnosis or emergent care that those symptoms indicated were required. *Id.* ¶¶ 51, 56, 60-63. Given the obviousness of that risk, including the risk of delay, it can be inferred that, in failing to seek emergent diagnosis and care for Mr. Kellom, both Dr. Miranda and Nurse James were deliberately indifferent to it. The Complaint has amply stated an Eighth Amendment claim against both defendants.

## II. The Complaint states a *Monell* claim against Centurion.

Centurion acknowledges that in contracting to provide healthcare it has taken on a governmental function and is therefore the "functional equivalent" of a municipality for purposes of Section 1983 liability under *Monell.* ECF 22 at 11. It argues, nevertheless, that the Complaint's allegations are insufficient to state a *Monell* claim against it. As Plaintiff sets out herein, that argument is simply wrong.

**A.** ***Centurion is liable for constitutional violations by its final policymaker, Dr. Miranda.*** As an initial matter, the defendants' motion does not challenge the Complaint's allegation that Dr. Miranda was director of dental services at CFRC, and thus exercised final policymaking authority for Centurion with respect to dental care decisions at that facility. *See* ECF 1 ¶¶ 81, 85. *Cf. Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989) (finding that final policymaking authority regarding medical decisions at a particular facility had been delegated to physician's assistant); *Kimbrough v. City of Cocoa*, No. 6:05-CV-471ORL31KRS, 2006 WL 2860926, at *5 (M.D. Fla. Oct. 4, 2006) (holding that under final policymaker doctrine, "[Doctor's] actions as the Medical Director for [the jail], are enough to establish [corporate medical vendor's *Monell*] liability under § 1983."). One route to *Monell* liability for a "municipal" defendant like Centurion is an unconstitutional decision by its final policymaker in a particular area. *Mandel*, 888 F.2d at 792. And as set forth *supra* in Part I, Plaintiff has alleged that Dr. Miranda was deliberately indifferent to Mr.

Kellom's medical needs in violation of the Eighth Amendment. For this reason alone Centurion's motion to dismiss the *Monell* claim against it should be denied.

***B. The Complaint has adequately alleged that Centurion had de facto policies of providing inadequate care.*** A *Monell* plaintiff can establish liability for an entity like Centurion by showing that the municipality has policies and practices leading to abuse. "A municipality can be sued directly under § 1983 when one of its customs, practices, or policies causes a constitutional injury." *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020). "[A] municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001). In turn, "[a] custom requires the plaintiff to identify evidence showing a pattern of similar constitutional violations," *Perez v. City of Sweetwater*, 770 F. App'x 967, 972 (11th Cir. 2019) (quotation omitted), sufficient to put a municipality's policymakers on actual or constructive notice of the pattern. *Id.* at 975.

The Complaint alleges multiple instances in which Centurion employees provided inadequate medical care to FDC prisoners. ECF 1 ¶ 80(a)-(d); *supra* at 7-8. Centurion does not argue that these incidents, *qua* incidents, are insufficiently numerous to establish a pattern at the pleading stage. Rather, it makes two other arguments. Neither one has merit. ***First***, Centurion argues that the identified incidents are not sufficiently similar because they do not involve dental care. ECF 22

at 12-14. This argument misunderstands what *Monell* requires. Plaintiff's *Monell* theory is not that Centurion has a custom of providing inadequate dental care. Rather, Plaintiff alleges the company has a custom pursuant to which staff disregard reports by patients of objectively serious symptoms; refuse to obtain diagnostic testing; fail to develop sensible treatment plans; and the like. *See* ECF 1 ¶ 75. None of those theories turn on the delivery of dental care specifically, and they do not have to. *See, e.g.*, *Davies v. Israel*, 342 F. Supp. 3d 1302, 1307 (S.D. Fla. 2018) (holding that where a *Monell* theory is grounded in a failure to obtain medical care for detainees suffering medical conditions, examples from different conditions, including "sepsis, pneumonia, starvation, hemorrhaging, etc.," were sufficient to plead a widespread practice); *Boyer v. Advanced Corr. Healthcare, Inc.*, No. 20-CV-1123, 2023 WL 3978147, at *7 (W.D. Wis. June 13, 2023) (holding that under the plaintiff's *Monell* theory, "it makes no difference whether the [other] inmate's need for outside emergency care or treatment in these other cases was the result of a cardiac issue or some other medical condition, or even if it resulted in a similar injury."); *Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278, 2022 WL 4290528, at *53 (D. Md. Sept. 16, 2022) (finding similar on summary judgment with respect to factual differences in other medical incidents identified by plaintiff). Each of the examples cited in the Complaint involves failures by Centurion employees to address serious conditions that required medical attention, and thus is similar to what happened to Mr. Kellom. The failure to address Mr. Kellom's care, indeed, bears a striking resemblance to the care provided to Curtis Dettmann, a young man who, like Mr. Kellom, began

experiencing symptoms of sepsis from a deadly bacterial infection that were repeatedly ignored by Centurion medical staff. *See* ECF 1 ¶ 80(a). As the Complaint alleges, Mr. Dettmann sued, *id.*, so Centurion inarguably had notice of the catastrophic medical failures in that case. Indeed the Complaint alleges a broad pattern of such failures, including the failure to provide eye surgery to hundreds of prisoners. *See id.* ¶ 80(d). Aside from pointing out that these cases do not involve dental care, Centurion offers no argument regarding why they should not fit and support Plaintiff's *Monell* theory.

***Second***, Centurion contends that some of Plaintiff's examples occurred after Mr. Kellom's case. ECF 22 at 15. This, apparently, refers to some of the thousand-plus patients whom Centurion has denied eye surgery, *see* ECF 1 ¶ 80(d). That misunderstands the law, since "post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015). *Accord Abdur-Rahim v. City of Columbus*, No. 2:17-CV-601, 2019 WL 1873222, at *3 (S.D. Ohio Apr. 26, 2019) (surveying *Salvato* and other decisions to observe that "the clear majority of case law . . . [holds] that subsequent incidents could be probative of what policies, practices, or accepted customs existed at the time of the incident at issue, which would be relevant to Plaintiffs' *Monell* claims."). Centurion's subsequent-incident argument fails.

The Complaint pleads a Section 1983 *Monell* claim against Centurion.[1]

## III. The Complaint's state law claims should not be dismissed.

**A. *The Complaint states an IIED claim.*** The defendants argue Plaintiff does not state an intentional infliction of emotional distress ("IIED") claim, ECF 22 at 20-22, but they are mistaken. The elements of IIED are that (1) the defendant acted recklessly or intentionally; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; (4) the distress was severe. *Johnson v. Thigpen*, 788 So. 2d 410, 412 (Fla. 1st DCA 2001). The viability of such a claim "is highly fact-dependent and turns on the sum of the allegations in the specific case at bar." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985).

As to the first element, a plaintiff need not show that the defendant intended to inflict severe emotional distress; "all that need be shown is that he intended his specific behavior and knew or should have known that the distress would follow." *Dominguez v. Equitable Life Assur. Soc'y of U.S.*, 438 So. 2d 58, 59 n.1 (Fla. 3d DCA 1983). The allegations that support deliberate indifference establish the requisite intent here: the Defendants were aware of Mr. Kellom's obvious and worsening symptoms of a spreading, potentially fatal infection, yet chose not to diagnose or treat the underlying condition. ECF 1 ¶¶ 41–43, 55–63.

[1] Count 8 of the Complaint additionally asserts a *respondeat superior* claim against Centurion sounding in Section 1983. See ECF 1 ¶¶ 112-15. Plaintiff recognizes that Section 1983 currently does not impose *respondeat superior* liability on private entities. Other courts of appeal have criticized this doctrine, however, and have suggested that it be changed. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 792–96 (7th Cir. 2014). Plaintiff therefore asserts this *respondeat superior* claim to preserve it.

As to the second element, Florida courts have held that a person with authority over an individual's medical care engages in outrageous conduct by unjustifiably failing to authorize life-saving treatment. *See Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592 (Fla. 2d DCA 2007) (allegations that defendant unjustifiably delayed plaintiff's transplant, hastening his death, stated a claim for IIED). That element is easily satisfied in this case.

The third and fourth elements are likewise met. The Complaint alleges that Mr. Kellom's infection was treatable and that timely diagnosis and care would have prevented his suffering and death (ECF 1 ¶¶ 28, 33, 60), and that, as a direct and proximate result of Defendants' misconduct, Mr. Kellom experienced severe injuries, including severe emotional distress, before his death (ECF 1 ¶ 111). Whether conduct is sufficiently outrageous is ordinarily a question informed by the full factual record; on these allegations, dismissal is not warranted.

**B. *The Florida Wrongful Death Act does not warrant dismissal of Count 6 & 7.***

The defendants argue that Plaintiff's medical negligence and IIED claims in Counts 6 and 7 must be dismissed because they are subsumed into the wrongful death claim. ECF 22 at 18-19. As an initial matter, Plaintiff's IIED claim in Count 7 cannot fall under this argument. Under the Wrongful Death Statute, "when death is the *result of a personal injury*, the law of Florida essentially substitutes a statutory wrongful death action for the personal injury action that would otherwise survive . . . ." *Niemi v. Brown & Williamson Tobacco Corp.*, 862 So. 2d 31, 33 (Fla. 2d DCA 2003) (emphasis added). There are certainly circumstances where a death would be the result of an

infliction of emotional distress, such as a person driven to suicide. But that is not the case here. Mr. Kellom's death was not the result of the emotional distress he experienced; it was the result of a systemic infection. ECF 1 ¶¶ 68-71. It follows that while the Count 6 medical negligence claim may partially be subsumed within the wrongful death claim, the medical negligence also caused Mr. Kellom to suffer the emotional distress that is the basis of the IIED claim. To that extent, certainly, it should not be dismissed. At a minimum, Plaintiff may plead these theories in the alternative at this stage, *see* Fed. R. Civ. P. 8(d)(2)-(3); *Groover v. Polk Cnty. Bd. of Cnty. Comm'rs*, No. 8:18-cv-02454, 2020 WL 2307558, at *4 (M.D. Fla. May 8, 2020), because Mr. Kellom endured weeks of suffering, including severe emotional distress, before his death on March 15, 2024. ECF 1 ¶¶ 64, 66, 70, 111. Counts 6 and 7 should not be dismissed.[2]

**C. *The medical negligence claim against Dr. Miranda should not be dismissed.***

Defendants also argue that the medical negligence claim against Dr. Miranda must be dismissed pursuant to Fla. Stat. § 768.28(9)(a). ECF 22 at 22-24. Defendants quote the relevant portion of Section 768.28(9)(a) in full, *see id.* at 22-23. The upshot of that law is that claims with allegations that involve "wanton and willful" conduct by a government employee must be brought against that employee personally, whereas claims that do not involve those allegations must be brought against the employer-entity itself. *See Tierney v. Jones*, No. 4:17-cv-05, 2018 WL 4212431 (N.D.

---

[2] Plaintiff agrees that Centurion would be immune from Plaintiff's IIED claim, for the reasons Centurion states in its brief. *See* ECF 22 at 17-18.

Fla. July 26, 2018). Defendants argue that under Section 768.28(9)(a), any conventional medical negligence claim may only be brought against Centurion, whereas the Complaint, as a substantive matter, does not state a claim for the "wanton and willful" conduct that could make Dr. Miranda personally liable. ECF 22 at 23-24. But "[t]he federal standard for deliberate indifference amounts to recklessness, and so does the standard of 'wanton and willful' conduct under Florida law." *Barreto-Baerga v. Osceola Cnty.*, No. 6:25-cv-98-PGB-LHP, 2026 WL 851667, at *6 (M.D. Fla. Mar. 29, 2026) (citing *Turner v. Phillips*, No. 21-12370, 2022 WL 458238, at *2 (11th Cir. Feb. 15, 2022)). Because the Complaint adequately alleges that Dr. Miranda acted with deliberate indifference to Mr. Kellom's serious medical needs, *supra* Part I; ECF 1 ¶¶ 34-38, 52-61, it likewise alleges the "wanton and willful" conduct that permits a medical negligence claim against Dr. Miranda personally. The claim against Dr. Miranda should not be dismissed.

**IV. Plaintiff's request for punitive damages is properly pleaded.**

Defendants' challenge to Plaintiff's punitive-damages requests rises and falls with their challenge to the underlying claims. ECF 22 at 20–21. Punitive damages are available under § 1983 where a defendant's conduct is "motivated by evil motive or intent, or . . . involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). For the reasons explained above, Plaintiff has adequately alleged that the Defendants acted with reckless or callous indifference to Mr. Kellom's constitutional rights—ignoring obvious, escalating signs of a deadly infection over the course of nearly two weeks. ECF 1 ¶¶

41–43, 55–63, 110. Those allegations support a request for punitive damages on the § 1983 claims. Plaintiff does not dispute that punitive damages are not cognizable under her state law claims.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss. In the alternative, should the Court find any pleading deficiency, Plaintiff respectfully requests leave to amend.

Dated: July 1, 2026

Respectfully submitted,

/s/ *Stephen H. Weil*

Natalie Robinson
BEN CRUMP LAW, PLLC
121 S. Orange Ave.
Orlando, FL 32801
(407) 749-9702
natalie@bencrump.com

Michael D. Cerasa
Florida Bar No. 0015085
Stephen H. Weil*
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, IL 60654
(312) 253-8592
sweil@rblaw.net

Attorneys for Plaintiff

* Admitted *pro hac vice*